03-5037 JRT/FLN

STATE OF MINNESOTA

IN SUPREME COURT

A04-1646

RECEIVED
BY MAIL

AUG 1 7 2005

CLERK US DIST COURT
MINNEAPOLIS MN

Certified Question
U.S. District Court, District of Minnesota

Anderson, Paul H., J.
Took no part, Page, J.

Phyllis Kahn, et al.,

                    Plaintiffs,

vs.

Susanne Griffin, City of Minneapolis
Director of Elections, et al.,

                    Defendants.

Filed: August 11, 2005
Office of Appellate Courts

SYLLABUS

Under the specific facts and circumstances presented in the Federal District Court's certified question, the Minnesota Constitution does not provide greater protection to the right to vote than does the United States Constitution; therefore, the failure of the City of Minneapolis to hold elections immediately following the city's decennial redistricting of its wards did not violate the Minnesota Constitution.

The failure of the City of Minneapolis to hold elections immediately following the city's decennial redistricting of its wards did not violate Minn. Stat. §§ 204B.135, subd. 1, and 204B.14, subd. 1a (2004).

Certified question answered in the negative.

Heard, considered, and decided by the court en banc.

SCANNED
AUG 1 7 2005
U.S. DISTRICT COURT MPLS

OPINION

ANDERSON, Paul H., Justice.

This case is before us on a certified question from the United States District Court for the District of Minnesota. The federal court's certified question implicates both the Minnesota Constitution and state statutes and is as follows:

> Does the Minnesota Constitution provide greater protections to the right to vote than does the United States Constitution such that failure to hold prompt elections following decennial redistricting violates (a) the Minnesota Constitution and/or (b) Minnesota Statutes §§ 204B.135, subd. 1, and 204B.14, subd. 1a?[1]

Under Minnesota law, state legislative redistricting occurs every ten years, following the completion of the decennial United States Census. Minn. Const. art. IV, § 3. After the completion of legislative redistricting, municipalities that elect council members by wards must redistrict "within 60 days after the legislature has been redistricted, or at least 19 weeks before the state primary election in the year ending in two, whichever is first." Minn. Stat. § 204B.135, subd. 1 (2004). On March 19, 2002, the Minnesota Special Redistricting Panel issued its final order adopting congressional and state legislative redistricting plans. No one appealed the panel's order establishing the redistricting plans. The City of Minneapolis elects its city council members by wards; therefore, the Minneapolis Redistricting Commission drew new ward boundaries based on the 2000 census data and then filed its final plan on April 18, 2002.

---

[1]     *See Kahn v. Griffin*, 2004 WL 1635846, *13 (D. Minn. July 20, 2004).

In November 2001, the City of Minneapolis held elections for council members using ward boundaries drawn in 1992 based on the 1990 decennial census data. The Minneapolis City Charter provides that council members serve four-year terms. Minneapolis, Minnesota City Charter, ch. 2, § 3 (2004). The charter also provides that council members "may complete the term for which they are elected or appointed notwithstanding changes in Ward boundaries." *Id.*, ch. 1, § 3. Thus, elections in the City of Minneapolis utilizing the ward boundaries that the Minneapolis Redistricting Commission drew in 2002 will not take place until November 2005. According to the decennial census, the official population of the City of Minneapolis in 2000 was 382,618 people. The parties agreed that because the City of Minneapolis has 13 wards and the population should be distributed evenly among the wards, the ideal population of each ward following the 2000 census should be 29,432. But as time has passed since the 1992 redistricting, population has become increasingly unevenly distributed among the 13 wards. Wards 2, 4, and 6 as drawn in 1992 contained more people than the ideal ward population, and Wards 1, 11, 12, and 13 contained fewer people than the ideal ward population.[2] There are no current council members residing within the boundaries of Wards 3 and 8 as drawn in the 2002 plan.

---

[2]      The population of Ward 2 is 32,793 (3,361 more than ideal), Ward 4 is 30,731 (1,299 more), Ward 6 is 33,364 (3,932 more). The population of Ward 1 is 26,949 (2,483 less than ideal), Ward 11 is 26,838 (2,594 less), Ward 12 is 27,353 (2,019 less), Ward 13 is 27,961 (1,471 less).

In July 2003, the plaintiffs, who are all citizens of the City of Minneapolis, commenced this action in Hennepin County District Court against the City of Minneapolis, Minneapolis Director of Elections Susanne Griffin, and the 13 incumbent city council members. The plaintiffs asked the court to "declare that Minneapolis City Charter and Code of Ordinances Chapter 1, § 3(F), to the extent that it allows current members of the Minneapolis City Council to continue to serve in malapportioned districts, is unconstitutional in violation of the above-cited provisions of the United States Constitution and the Constitution of Minnesota."[3] The plaintiffs also asked the court to "order the Defendants to immediately conduct a new election for the office of City Council member in each of the 13 wards of the City of Minneapolis in districts that are equally proportioned."

On August 20, 2003, the defendants successfully removed this case from the Hennepin County District Court to the United States District Court for the District of Minnesota, in accordance with 28 U.S.C. § 1441(a)-(b) (2000). When the federal district court accepted this case, it was assigned to Judge John Tunheim, after the court determined that it was suitable to be a companion to a case that was at that time pending before the same judge. *See Lee v. City of Minneapolis*, Civil File No. 02-1139 JRT/FLN. After further proceedings, both plaintiffs and defendants moved for summary judgment.

---

[3]     In the complaint, plaintiffs alleged that the Minneapolis City Charter and Code of Ordinances ch. 1, § 3(F), violates the Fifth and Fourteenth Amendments to the U.S. Constitution, and article I, § 2, and article VII, § 1, of the Minnesota Constitution.

The plaintiffs based their argument for summary judgment on the one person, one vote principle articulated by the United States Supreme Court in *Reynolds v. Sims*, 377 U.S. 533 (1964), and its progeny. In *Reynolds*, the Supreme Court concluded that "the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators." *Id.* at 566. The Court stated that "[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status." *Id.* (internal citations omitted). After hearing arguments from the parties, the federal court denied plaintiffs' motion for summary judgment and granted the defendants' motion.

In its memorandum order and opinion, the federal district court reiterated the one person, one vote principle established by the Supreme Court in *Reynolds*, which principle was made applicable to the states in *Avery v. Midland Cty.*, 390 U.S. 474 (1968). The court then noted that in *Political Action Conference of Illinois v. Daley*, 976 F.2d 335 (7th Cir. 1992), the Seventh Circuit considered an argument "almost identical" to plaintiffs' argument in this case. In *Political Action Conference of Illinois*, the Seventh Circuit deemed as the "critical question" whether the election at issue, which was held using a districting plan based on the previous decade's census data, remained valid under *Reynolds*. 976 F.2d at 340. The federal district court agreed with the Seventh Circuit and stated that, "absent a finding that the 2001 elections were based on districts that were so unrepresentative as to be unconstitutional, it would be inappropriate for this Court to interfere in a process and arena that is left to the state and, more particularly, to the

legislative branch of the state." 2004 WL 1635846 *3. The court went on to explain that Minneapolis's 2001 elections were based on a districting plan properly enacted following the 1990 census, and thus the elections were not "the result of an impermissibly delayed redistricting schedule." *Id.*

The federal district court recognized that the delay in the implementation of the districts drawn based on the 2000 census did burden the voting rights of Minneapolis residents. However, citing *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992) (internal citations omitted), and *Reynolds*, 377 U.S. at 577, the court observed that "while the right to vote is of fundamental import, it is not absolute, and must be weighed against other concerns." 2004 WL 635846 *4. The court cited several federal circuit court decisions upholding the validity of elections based on outdated redistricting plans, and noted that some of these cases presented "situations arguably more egregious than the one at hand."[4] *Id.* at *5. The court then balanced the burden on the right to vote against the interest advanced by the City which was the four-year term of office and election cycle for Minneapolis City Council members. The court also balanced the right to vote against the burden of implementing the relief sought by the plaintiffs, which was at a minimum the extra cost of planning for and implementing an election on short notice at least every 20 years. After considering the respective burdens and interests, the court concluded that

---

[4]     *Donatelli v. Mitchell*, 2 F.3d 508 (3rd Cir. 1993); *French v. Boner*, 963 F.2d 890 (6th Cir. 1992); *Political Action Conf. of Illinois v. Daley*, 976 F.2d 335 (9th Cir. 1992); *Republican Party of Oregon v. Kiesling*, 959 F.2d 144 (9th Cir. 1992); *Mader v. Cravell*, 498 F.Supp. 226 (M.D. Tenn. 1980); *Connor v. Williams*, 404 U.S. 549 (1972).

> while the laws at issue in this case certainly burden the one-person-one-vote principle, given the propriety of the redistricting process, and in light of the state's valid interests and the costs of implementing the relief requested, the burden presented by the present circumstances is not so severe as to qualify as a Constitutional violation.

*Id.* at *8. However, the court left open the possibility that the Minnesota Constitution could provide a greater degree of protection to the right to vote. The court then granted the plaintiffs' request to certify a state constitutional and statutory question to our court.

On September 8, 2004, we accepted the certified question from the federal district court asking us to determine if the Minnesota Constitution and/or Minn. Stat. §§ 204B.135, subd. 1, and 204B.14, subd. 1a, provide greater protections to the right to vote than does the United States Constitution. When we accepted the certified question, we directed the parties to not only address the certified question on its merits, but also whether the issues presented in the question are moot. The parties complied with this request when they submitted their briefs.

I.

We first consider whether the issues raised in the certified question are moot. It is a well-established rule in Minnesota that a court only has jurisdiction to issue a declaratory judgment if there is a justiciable controversy. *Minnesota Ass'n of Public Schools v. Hanson*, 287 Minn. 415, 419-20, 178 N.W.2d 846, 850 (1970). A controversy is only justiciable when it involves definite and concrete assertions of right. *Id.* at 420, 178 N.W.2d at 850. Merely possible or hypothetical injury will not satisfy this standard. *State v. Colsch*, 284 N.W.2d 839, 841-42 (Minn. 1979); *see also State ex rel. Smith v. Haveland*, 223 Minn. 89, 92-93, 25 N.W.2d 474, 477 (1946). The United States Supreme

7

Court explained: "mootness can be described as the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000).

We consider mootness "a flexible discretionary doctrine, not a mechanical rule that is invoked automatically." *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435, 439 (Minn. 2002) (*citing State v. Rud*, 359 N.W.2d 573, 576 (Minn. 1984)). Generally, we will dismiss a case as moot if we are unable to grant effectual relief. *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989). But we will not deem a case moot if it implicates issues that are capable of repetition, yet likely to evade review. *Elzie v. Comm'r of Pub. Safety*, 298 N.W.2d 29, 32 (Minn. 1980). The Supreme Court has determined that in the absence of a class action, the "capable of repetition, yet evading review" doctrine is "limited to the situation where two elements are combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). Additionally, we will not deem a case moot, and thus will retain jurisdiction, if the case is "functionally justiciable" and is an important public issue "of statewide significance that should be decided immediately." *State v. Brooks*, 604 N.W.2d 345, 347-48 (Minn. 2000).

Defendants argue that this case is moot because plaintiffs will experience an injury to their voting rights only if the City of Minneapolis holds an election after adopting and implementing a plan in which the redrawn wards remain malapportioned. In support of

8

their argument, defendants assert that redistricting orders apply only to future elections, and cite our holding in *Clayton v. Kiffmeyer* to support their position. 688 N.W.2d 117, 124 (2004). They claim that when municipal wards are redrawn, the new wards do not take effect until the next regularly scheduled election. Thus, defendants argue that every Minneapolis resident is currently represented by a city council member, and that each city council member was elected from a properly established ward. Further, defendants observe that plaintiffs' alleged injury-in-fact "amounts to an objection to the impact of the real life ebb and flow of residents" in each ward, and that shortly after the ward boundaries are redrawn, each ward will begin to vary from the ideal population simply because people move into and out of the wards on a regular basis.

The defendants' reliance on *Clayton* is misplaced. The controversy at issue in *Clayton* arose from a 2002 appointment to fill a vacancy on the Minnesota Court of Appeals. When the legislature created the court of appeals, it specified that one seat on that court shall be designated for each congressional district, and that the other seats be designated as at-large seats. *See* Minn. Stat. § 480A.02 (2004). All court of appeals judges are elected on a statewide basis. *Id.* In *Clayton*, we noted that the purpose for establishing the congressional district-designated seats was not to ensure that those judges represent the citizens of the designated congressional district, but rather to use the congressional districts as a proxy for providing geographic diversity on the court. *Clayton*, 688 N.W.2d at 125.

We stated in *Clayton* that the one person, one vote standard established in *Reynolds*, 377 U.S. at 568, does not apply to court of appeals elections because judges on

that court do not serve in a truly representative capacity.  688 N.W.2d at 125 (citing *Holshouser v. Scott*, 335 F. Supp. 928, 930 (M.D.N.C. 1971), *aff'd*, 409 U.S. 807 (1972)). *See also Dusch v. Davis*, 387 U.S. 112, 115-16 (1967) (rejecting a one person, one vote challenge to election of city council members based on residence in unequally populated boroughs because, despite the borough residency requirement, voting for all candidates was city-wide).  We then concluded that because congressional district seats on the court of appeals were not designated for purposes of representation but rather to ensure geographical diversity, "the fact that the existing boundaries would be unconstitutional as applied to future elections had no impact on [the districts'] viability for purposes of a present gubernatorial appointment." *Clayton*, 688 N.W.2d at 125.  Thus, the situation *Clayton* presented is distinguishable from the situation presented here because, unlike court of appeals judges, Minneapolis City Council members serve in a representative capacity and the wards are drawn for the purposes of voting and representation.

The Supreme Court has stated that the passage of an election before a court renders its decision will not necessarily render an election-related case moot; such cases may be exceptions to the mootness doctrine because they are "capable of repetition, yet evading review." *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974).  On this point, the federal district court observed:

> The situation presented by this case will not likely reappear for twenty years in the City of Minneapolis, but it is likely to reappear somewhere in Minnesota after each decennial census. In addition, the questions certified have potential ramifications for how other representative bodies, including the Minnesota Legislature, handle the redistricting process.

Here, we note that other cities in Minnesota have election systems similar to the City of Minneapolis. The City of Saint Paul, for example, is divided into seven contiguous districts of "substantially equal proportion," each represented by one council member. *See* Saint Paul, Minnesota City Charter, §§ 2.01, 2.02, 4.01.2, 4.01.3 (2004). All seven council members run for election at the same time for four-year terms, and the City of Saint Paul redistricts after every federal decennial census. *Id.* As previously noted, legislative redistricting occurs every ten years, following the decennial United States Census. It is anticipated that by sometime in early 2012, legislative redistricting will be completed, and shortly thereafter the City of Saint Paul will draw new districts for its city council. But the City of Saint Paul is expected to hold city council elections in 2011, using districts that were configured in 2002. Thus, Saint Paul City Council elections using the district boundaries that will likely be drawn by early 2012 may not take place until November 2015. Moreover, as the federal court observed, this same situation is expected to reoccur in Minneapolis in 2022.

Minneapolis and Saint Paul are the two largest cities in Minnesota, representing a total population of 669,769 and accounting for 13.6% of the state's 2000 population of 4,919,479 people. U.S. Census Bureau (2000) (available at http://www.census.gov/census2000/states/mn.html). As the plaintiffs note, neither city is unique—other municipalities throughout Minnesota will likely be presented with this same situation. Therefore, we conclude that the issues presented are of statewide significance, and the injury that the plaintiffs asserted is capable of repetition.

Accordingly, we hold that the issues presented in the certified question are not moot, but are capable of evading review if we hold the issues to be moot.

II.

We acknowledge the defendants' argument that plaintiffs do not have the requisite standing to maintain their action. But we note that the federal district court retained jurisdiction over this case as a whole. The federal court only asked us to answer a specific certified question that did not include the issue of standing, and we did not independently ask the parties to address that issue. Given this context, we conclude that the defendants inappropriately raised the issue of standing in our court, and therefore we decline to address this issue.

III.

We now turn to the specific certified question. In its order certifying this question, the federal district court stated: "the three-year delay in implementation of new wards that occurs as a result of the interplay between the redistricting schedule and the election schedule places a clear burden on the right to vote." Nevertheless, the court determined "as a matter of federal law, that that burden is outweighed by other considerations." But the court acknowledged that, under our federal system of government, state constitutions may provide greater protection for individual rights, stating that "a finding that the Minnesota Constitution provides a greater degree of protection to the right to vote could shift that calculus." The court then certified the question to our court.

We agree with the federal district court that an interpretation of the Minnesota Constitution must be part of the "calculus" used to determine the ultimate outcome in this

12

case. As Justice William Brennan said: "The strength of our [federal] system is that it 'provides a double source of protection for the rights of our citizens.'" William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. Rev. 535, 552 (1986). Our federal system requires an interplay between federal and state courts, and is not well served when "one level of government take[s] a back seat to the other when the question * * * is one of individual civil and political rights." *Id.* To quote Justice Brennan further:

> [S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977).

The United States Supreme Court has specifically acknowledged that state constitutions are a separate source of citizens' rights and that state courts may reach conclusions based on their state constitutions, independent and separate from the U.S. Constitution. *See Michigan v. Long*, 463 U.S. 1032, 1041 (1983); *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 80-81 (1980). But state supreme courts are subject "to the qualification that [their] interpretations may not restrict the guarantees assured * * * under the federal charter." *Serrano v. Priest*, 557 P.2d 929, 950 (Cal. 1976). The Supreme Court has said that states may not interpret their constitutions to provide less protection for rights "fundamental to the American scheme of justice" than the protection

those rights receive under the federal constitution. *See Benton v. Maryland*, 395 U.S. 784, 795 (1969) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)).

Historically, when independently interpreting the Minnesota Constitution, we have required the use of certain underlying principles to guide our analysis. We have indicated that we will not construe our state constitution as providing more protection for individual rights than does the federal constitution unless there is a principled basis to do so. *State v. Harris,* 590 N.W.2d 90, 97-98 (Minn. 1999). We adhere to the general principle of favoring uniformity with the federal constitution. We will not reject a Supreme Court interpretation of a provision of the U.S. Constitution merely because we want to bring about a different result. *Women of the State of MN v. Gomez*, 542 N.W.2d 17, 30 (Minn. 1995). We have also said that we will not lightly reject a Supreme Court interpretation of identical or substantially similar language. *Harris,* 590 N.W.2d at 97-98. Favoring uniformity with Supreme Court interpretation of constitutional law reflects our belief in the primacy of the federal constitution in matters affecting individual liberties, even if the Supreme Court's interpretation is not always determinative. Moreover, uniformity places a value on consistency of practice in state and federal courts and the availability of ample federal case law that assists in illuminating the issues when addressing similar state constitutional provisions.

We have acknowledged that it is a significant undertaking to independently interpret a provision of our state constitution to allow greater protection of our citizens' rights, particularly when there exists a federal counterpart provision with identical or substantially similar language and there are Supreme Court precedents interpreting that

language. *Gomez,* 542 N.W.2d at 30. We have repeatedly stated that we will not "cavalierly construe our state constitution more expansively than the United States Supreme Court has construed the federal constitution." *State v. Fuller,* 374 N.W.2d 722, 726-27 (Minn. 1985); *see also State v. Carter,* 697 N.W.2d 199, 210 (Minn. 2005); *State v. Askerooth,* 681 N.W.2d 353, 362 (Minn. 2004); *Wiegand,* 645 N.W.2d 125, 132 (Minn. 2002); *Harris,* 590 N.W.2d at 98; *In re Welfare of E.D.J.,* 502 N.W.2d 779, 781 (Minn. 1993); and *State v. Gray,* 413 N.W.2d 107, 111 (Minn. 1987). Generally, we do not independently apply our state constitution absent language, concerns, and traditions unique to Minnesota. *Harris,* 590 N.W.2d at 97-98.

When interpreting the Minnesota Constitution, we have said that we will first examine the language of the constitutional provision in question to determine whether it is ambiguous. *See State v. Brooks,* 604 N.W.2d 345, 348 (Minn. 2000) (interpreting article I, § 7). When constitutional language is unambiguous, it is effective as written and we do not apply any other rules of construction. *Id.* But if the language in the constitution is ambiguous, we seek to discover its meaning by looking beyond the language for other indicia of intent. *Id.* We will seek, whenever reasonably possible, to resolve that ambiguity in a way that forwards the apparent purpose for which the provision was adopted. *Id.* We will strive to ascertain and give effect to the intent of the constitution as indicated by the framers and the people who ratified it. *Reed v. Bjornson,* 191 Minn. 254, 258-59, 253 N.W. 102, 104 (1934).[5] On these occasions, we will look to

---

5       In *Reed v. Bjornson,* we have stated that our aim

(Footnote continued on next page.)

the history and circumstances of the times and the state of things existing when the

constitutional provisions were framed and ratified in order to ascertain the mischief

addressed and the remedy sought by the particular provision. *Id.*

Our approach to interpreting the Minnesota Constitution has evolved over the past

century. During the late 19th century and the first half of the 20th century, we took a

cautious approach when interpreting our state constitution when presented with cases

implicating the Due Process Clauses of the federal and state constitutions. In *State v.

Weyerhauser*, 72 Minn. 519, 520-21, 75 N.W. 718, 718 (1898), we stated that

"fundamental constitutional [due process] principles are common to both the federal and

the state constitutions, and the only effect of making them a part of the [federal

constitution] is to render the supreme court of the United States the final arbiter in cases

---

(Footnote continued from previous page.)

> is to discover the meaning, to ascertain and give effect to the intent of its
> framers and the people who adopted it.  * * *  The necessities which gave
> rise to the provision, the controversies which preceded, as well as the
> conflicts of opinion which were settled by its adoption, are matters to be
> considered to enable us to arrive at a correct result.  * * *  The history of
> the times, the state of things existing when the provision was framed and
> adopted should be looked to in order to ascertain the mischief and the
> remedy.  * * *  As nearly as possible we should place ourselves in the
> condition of those who framed and adopted it.  * * *  And, if the meaning
> be at all doubtful, the doubt should be resolved, wherever reasonably
> possible to do so, in a way to forward the evident purpose with which the
> provision was adopted.

191 Minn. 254, 258-59, 253 N.W. 102, 104 (1934) (quoting *Home Building Loan Ass'n
v. Blaisdell*, 290 U.S. 398, 453 (1934) (Sutherland, J., dissenting) (omissions in
original)).

where their violation by a state is complained of." In *W.J. Armstrong Co. v. New York Cent. & H.R.R. Co.*, 129 Minn. 104, 108, 151 N.W. 917, 918 (1915), we stated that

> [t]he Constitution of this state contains a provision similar to that contained in the [F]ourteenth [A]mendment (State Const. art. 1, § 7), so that these fundamental principles are now common to both the federal and the state Constitutions. [Therefore] * * * the Supreme Court of the United States is the final arbiter in cases where the application of these principles comes into question, and such cases are accordingly controlled by the decisions of that court.

We then said in *State v. Northwest Airlines, Inc.*, 213 Minn. 395, 399, 7 N.W.2d 691, 694 (1942), that "it is unnecessary to consider separately the due process clauses of the state and federal constitutions" because "[i]t is our aim to follow the decisions of the Supreme Court of the United States" (quoting *In Re Taylor's Estate*, 175 Minn. 310, 315, 221 N.W. 64, 65 (1928)). Finally, in *Anderson v. City of Saint Paul*, 226 Minn. 186, 190, 32 N.W.2d 538, 541 (1948), we established that the Due Process Clause of our state constitution is not more restrictive than the Due Process Clause of the Fourteenth Amendment, and so Supreme Court decisions under the Fourteenth Amendment shall dispose of the questions raised so far as our state constitution is concerned.

Approximately 40 years ago, we began to change how we view the use of United States Supreme Court precedent on issues implicating the Minnesota Constitution. This change was signaled by our decision in a case in which we interpreted the identical due process provisions of the federal and state constitutions. In *State v. Oman*, 261 Minn. 10, 110 N.W.2d 514 (1961), we gave authority to the criteria articulated by Chief Justice Charles Loring in his dissenting opinion in *State v. Lanesboro Produce & Hatchery Co.*,

221 Minn. 246, 265, 21 N.W.2d 792, 800 (1946).  Quoting Chief Justice Loring, the court said:

> When we apply our state due process clause, we are not bound to follow any interpretive relaxation of the inhibitions of the Fourteenth Amendment made by the Supreme Court of the United States.  We are bound by the decisions of that court as to what the due process clause of the Fourteenth Amendment prohibits; but, in interpreting our own clause, we are not bound to follow what that court says is not a violation of the Fourteenth Amendment.  We should exercise our own judicial judgment as to what we deem a violation of our own constitution.

*Oman*, 261 Minn. at 21, 110 N.W.2d at 522-23 (quoting *Lanesboro*, 221 Minn. at 265, 21 N.W.2d. at 800).

We subsequently reiterated this view in *State v. Fuller*, when we said "a decision of the United States Supreme Court interpreting a comparable provision of the federal constitution that, as here, is textually identical to a provision of our constitution is of inherently persuasive, although not necessarily compelling, force."  374 N.W.2d at 727. *See also State v. Hamm*, 423 N.W.2d 379, 382 (Minn. 1988); *In re Welfare of E.D.J.*, 502 N.W.2d at 781; *Harris*, 590 N.W.2d at 97; *In re Welfare of B.R.K.*, 658 N.W.2d 565, 577 (Minn. 2003).  In *Fuller*, we also echoed the sentiments expressed by the Supreme Court in *Long* when we said:

> It is axiomatic that a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution (citations omitted).  Indeed, as the highest court of this state, we are "independently responsible for safeguarding the rights of [our] citizens (quoting *People v. Brisendine*, 531 P.2d 1099, 1114 (Cal. 1975)).  State courts are, and should be, the first line of defense for individual liberties within the federalist system.

374 N.W.2d at 726.

Since the 1970s, our court, like most other state supreme courts, has exhibited a greater willingness to look to our state constitution when determining individual rights and liberties. *See* Robert K. Fitzpatrick, *Neither Icarus Nor Ostrich: State Constitutions as an Independent Source of Individual Rights*, 79 N.Y.U. L. Rev. 1833 (2004). This trend has been referred to as the "new judicial federalism." *See* G. Alan Tarr, *The New Judicial Federalism in Perspective,* 72 Notre Dame L. Rev. 1097, 1118 (1997). This new judicial federalism is at least in part rooted in the process by which the United States Supreme Court, under the Fourteenth Amendment, applied to the states many of the provisions contained in the Bill of Rights. *See Benton*, 395 U.S. 784. *See also Duncan*, 391 U.S. 145; *Washington v. Texas*, 388 U.S. 14 (1967); *Malloy v. Hogan*, 378 U.S. 1 (1964). This process has transformed the basic structure of the constitutional safeguards for individual liberties and the role of the states in our federal system of government. The new judicial federalism has also been motivated in part by the Supreme Court's recent willingness to narrow the ambit of the Fourth and Fourteenth Amendments. Schapiro, supra, at 420. *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001); *California v. Hodari D.*, 499 U.S. 621 (1991). That we have acknowledged this concept of federalism is evidenced by the fact that, during the past two decades, we have independently interpreted and applied our state constitution on issues such as search and seizure,[6] equal protection,[7] right to counsel,[8] privacy,[9] and freedom of conscience—religious beliefs.[10]

---

[6]     *Carter*, 697 N.W.2d 199 (dog sniff of self-storage unit); *Askerooth*, 681 N.W.2d
(Footnote continued on next page.)

It is now axiomatic that we can and will interpret our state constitution to afford greater protections of individual civil and political rights than does the federal constitution. *Harris*, 590 N.W.2d at 97 (citing to *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81 (1980)); *Fuller*, 374 N.W.2d at 726. As the highest court of this state, we have said that we are and should be the "first line of defense for individual liberties

---

(Footnote continued from previous page.)
353 (traffic stop confinement in back seat of squad car); *State v. Fort*, 660 N.W.2d 415 (Minn. 2003) (extending detention during a routine traffic stop constitutes a seizure); *In re Welfare of B.R.K.*, 658 N.W.2d 565 (short-term social guest in a host's home had reasonable expectation of privacy); *Wiegand*, 645 N.W.2d at 132 (dog sniff of motor vehicle); *Harris*, 590 N.W.2d 90 (bus passenger not seized under state constitution); *State v. Cripps*, 533 N.W.2d 388 (1995) (seizure of an underage patron in a bar); *Ascher v. Comm'r of Public Safety*, 519 N.W.2d 183 (Minn. 1994) (sobriety checkpoint roadblock to stop motor vehicles); *In re Welfare of E.D.J.*, 502 N.W.2d 779 (seizure of person standing on street corner); *Fuller*, 374 N.W.2d 722 (double jeopardy clause of state constitution did not bar retrial); *O'Connor v. Johnson*, 287 N.W.2d 400 (Minn. 1979) (warrant authorizing search of attorney's office invalid under both federal and state constitutions).

[7]   *State v. Garcia*, 683 N.W.2d 294 (Minn. 2004) (jail credit for time served in custody for an Extended Jurisdiction Juvenile); *Skeen v. State*, 505 N.W.2d 299 (Minn. 1993) (funding of public education); *State v. Russell*, 477 N.W.2d 886 (Minn. 1991) (statutory distinction between quantities of crack cocaine and powder cocaine).

[8]   *Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828 (Minn. 1991) (right to counsel in context of chemical testing for blood alcohol to determine possible charge for driving under the influence violation).

[9]   *Gomez*, 542 N.W.2d 17 (woman's right to choose to have an abortion); *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988) (forcible administration of neuroleptic drugs without prior judicial approval violated right to privacy under state constitution); *State v. Gray*, 413 N.W.2d 107 (Minn. 1987) (sodomous acts within sex-for-compensation relationship not afforded constitutional protection under state constitution).

[10]   *State v. Hershberger*, 462 N.W.2d 393 (Minn. 1990) (display of slow-moving vehicle emblem on Amish defendant's vehicle).

within the federalist system." *Fuller*, 374 N.W.2d at 726; *Harris*, 590 N.W.2d at 97. We have stated that we have a duty to independently safeguard the rights of our citizens. *Carter*, 596 N.W.2d 654, 657 (Minn. 1999); *Harris*, 374 N.W.2d at 97; *Johnson*, 287 N.W.2d at 405.

The foregoing review of our case law demonstrates that we have established a definite baseline for how we approach the task of interpreting a provision of the Minnesota Constitution, especially when there is an identical or substantially similar federal counterpart. To briefly summarize, we traditionally approach this task with restraint and some delicacy. Moreover, we will not, on some slight implication and vague conjecture,[11] depart from federal precedent or the general principle that favors uniformity with the federal constitution. But, when we reach a clear and strong conviction that there is a principled basis for greater protection of the individual civil and political rights of our citizens under the Minnesota Constitution, we will not hesitate to interpret the constitution to independently safeguard those rights. On all occasions, we will exercise our independent judgment as to how to interpret the Minnesota Constitution.

Our precedent indicates that we are most inclined to look to the Minnesota Constitution when we determine that our state constitution's language is different from the language used in the U.S. Constitution or that state constitutional language guarantees a fundamental right that is not enumerated in the U.S. Constitution. *Skeen*, 505 N.W.2d

---

[11] *See Fletcher v. Peck*, 10 U.S. 87, 128, where Chief Justice John Marshall used similar language when addressing the different issue of whether the Supreme Court should hold that a federal statute violated the U.S. Constitution.

299.   We take a more restrained approach when both constitutions use identical or substantially similar language.  But we will look to the Minnesota Constitution when we conclude that the United States Supreme Court has made a sharp or radical departure from its previous decisions or approach to the law and when we discern no persuasive reason to follow such a departure. *See Carter*, 697 N.W.2d at 213; *Wiegand*, 645 N.W.2d 125; *In re Welfare of E.D.J.*, 502 N.W.2d 779.  We also will apply the state constitution if we determine that the Supreme Court has retrenched on Bill of Rights issues, or if we determine that federal precedent does not adequately protect our citizens' basic rights and liberties. *Hershberger*, 462 N.W.2d at 397-99; *Friedman v. Comm'r of Public Safety*, 473 N.W.2d 828, 830 (Minn. 1991); *Skeen*, 505 N.W.2d at 313-15.

Finally, our recent focus on our state constitution has increased the possibility that it may be relevant to any given case.  Litigants who appear before our court can and should be of significant assistance when we address a provision of the state constitution. Thus, we suggest that, as a general rule, there are certain factors that litigants should consider when addressing an issue that may implicate a separate independent analysis under the Minnesota Constitution.  The following nonexclusive list of factors should prove useful: (1) the text of the state Constitution, (2) the history of the state constitutional provision, (3) relevant state case law, (4) the text of any counterpart in the U.S. Constitution, (5) related federal precedent and relevant case law from other states that have addressed identical or substantially similar constitutional language, (6) policy considerations, including unique, distinct, or peculiar issues of state and local concern,

and (7) the applicability of the foregoing factors within the context of the modern scheme of state jurisprudence.[12]

## IV.

With the foregoing principles and precedents in mind, we proceed to determine whether the failure of the City of Minneapolis to hold elections immediately following the decennial legislative redistricting violates article I, § 2, and article VII, § 1, of the Minnesota Constitution.[13]  Plaintiffs contend that when a provision of the Minnesota

---

[12]    *See Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991), where then Associate Justice and now Chief Justice of the Pennsylvania Supreme Court Ralph J. Cappy articulated a similar list of factors for litigants addressing state constitutional issues.

[13]    The relevant part of article I, § 2, of the Minnesota Constitution is similar to Section 1 of the Fourteenth Amendment to the U.S. Constitution.  Section 1 of the Fourteenth Amendment reads:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, *without due process of law*; nor deny to any person within its jurisdiction the *equal protection of the laws.*

(Emphasis added.)

The relevant part of article I, § 2, of the Minnesota Constitution reads:

> RIGHTS AND PRIVILEGES. No member of this state shall be *disfranchised or deprived of any of the rights or privileges secured to any citizen thereof,* unless by the law of the land or the judgment of his peers.

(Emphasis added.)

Article VII, § 1, of the Minnesota Constitution establishes the criteria that citizens must fulfill in order to be eligible to vote in Minnesota, and reads:

(Footnote continued on next page.)

Constitution explicitly enumerates a right and the U.S. Constitution does not, that right deserves greater protection under the Minnesota Constitution. Plaintiffs argue that article VII, § 1, of the Minnesota Constitution explicitly enumerates a right to vote, whereas the U.S. Constitution does not state that right in explicit terms. They assert that in the U.S. Constitution the right to vote must be inferred from language listing factors that are illegitimate in denying citizens their ability to exercise their right to vote. They also argue that article I, § 2, of the Minnesota Constitution specifically mentions "the franchise," but the U.S. Constitution's Equal Protection Clause does not.

Plaintiffs rely heavily on what they assert is an analogous decision in *Skeen* to support their contention that voting rights are entitled to greater protection under the Minnesota Constitution than under the federal constitution. In *Skeen*, we held that the right to education enjoys greater protection in Minnesota because the right to education is explicitly enumerated in the Minnesota Constitution, but not in the U.S. Constitution. *See* 505 N.W.2d at 313. We held that education is a fundamental right under the

---

(Footnote continued from previous page.)

ELIGIBILITY; PLACE OF VOTING; INELIGIBLE PERSONS. Every person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct. The place of voting by one otherwise qualified who has changed his residence within 30 days preceding the election shall be prescribed by law. The following persons shall not be entitled or permitted to vote at any election in this state: A person not meeting the above requirements; a person who has been convicted of treason or felony, unless restored to civil rights; a person under guardianship, or a person who is insane or not mentally competent.

Minnesota Constitution, even though the United States Supreme Court held that education is not a fundamental right under the U.S. Constitution. *Id.* at 314; *see San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1 (1973). We explained in *Skeen* that the right to education is fundamental in Minnesota "not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate." *Skeen*, 505 N.W.2d at 313.[14] When we concluded that the right to education in Minnesota is fundamental, we relied in part on our observation that the Education Clause of the Minnesota Constitution contains language such as "shall," and places a "duty" on the legislature to establish a "general and uniform" system of public schools. *Id.* at 313. Plaintiffs emphasize this part of our analysis in *Skeen* to support their argument, but we conclude that this emphasis is misplaced.

Here, we observe that regardless of whether the right to vote is explicitly stated or its existence is implied, the right to vote is considered fundamental under *both* the U.S. Constitution and the Minnesota Constitution. *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Ulland v. Growe*, 262 N.W.2d 412, 415 (Minn.

---

[14]     The "Education Clause," found in article XIII, § 1, of the Minnesota Constitution, reads:

> The stability of a republican form of government depending mainly on the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.

1978).  Thus, the line of reasoning that we employed in *Skeen* is distinguishable.  505 N.W.2d at 314.  Unlike the right to vote, the right to education is not considered a fundamental right under the U.S. Constitution.  *See Rodriguez.*, 411 U.S. at 33-34.  When we were called upon to interpret the right to education under the Minnesota Constitution, we were presented with the opportunity to travel down one of two distinct paths.  We could have sought uniformity by holding that the right to education is not a fundamental right under our constitution.  Alternatively, we could have charted our own independent course based on the language of the Minnesota Constitution.  We chose the latter course when we held that under the specific language in our state constitution the right to education is a fundamental right.

As noted above, the Supreme Court has held that, unlike the right to education, the right to vote is a fundamental right under the U.S. Constitution.  This holding narrows considerably the leeway we have to independently conclude that the right to vote is deserving of greater protection under the Minnesota Constitution, based solely on the ground that the right to vote is a fundamental right because it is explicitly enumerated in the Minnesota Constitution.  Because the right to vote is a fundamental right under both constitutions, we conclude that the fact that the right to vote is explicitly enumerated in the Minnesota Constitution does not, standing alone, support a holding that the right to vote deserves greater protection under our state constitution.

Plaintiffs also contend that article I, § 2, of the Minnesota Constitution establishes a more stringent standard of review with respect to issues implicating the right to vote than does the Equal Protection Clause of the U.S. Constitution.  In so contending,

plaintiffs rely on *Russell*, 477 N.W.2d 886. In *Russell*, we determined that Minn. Const. art. I, § 2, established a higher standard of rational basis review than does the Equal Protection Clause of the U.S. Constitution.

Plaintiffs' reliance on *Russell* is also misplaced. As previously noted, the right to vote is a fundamental right under both the U.S. Constitution and the Minnesota Constitution. *See Reynolds*, 377 U.S. at 555; *Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 730 (Minn. 2003). Because the right to vote is a fundamental right, the Supreme Court has held that courts are to analyze potential governmental infringements of that right using a *strict scrutiny* standard of review. *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969). Strict scrutiny is the most rigorous standard of review of the three levels of scrutiny that courts have formulated. *Miller v. Johnson*, 515 U.S. 900, 920 (1995) ("As a result, Georgia's congressional redistricting plan cannot be upheld unless it satisfies strict scrutiny, our most rigorous and exacting standard of constitutional review."). *See also Bernal v. Fainter*, 467 U.S. 216, 219 (1984) ("In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available."). Accordingly, for right-to-vote cases in Minnesota, we employ the same strict scrutiny standard of review for our state constitution as is required under the U.S. Constitution. *See Skeen*, 505 N.W.2d at 312. Because the strict scrutiny standard of review is applied to the language of both constitutions, we conclude that article I, § 2, does not support plaintiffs' argument that the right to vote is reviewed at a more rigorous level of scrutiny under the Minnesota Constitution than under the U.S. Constitution.

Therefore, contrary to plaintiffs' contention, Supreme Court precedent cannot be distinguished on this basis.

Plaintiffs next urge us to conclude that the framers of the Minnesota Constitution intended that our state constitution offer greater protection for the right to vote than the U.S. Constitution.  They base this argument on the premise that in article VII, § 1, the framers of the original 1857 Minnesota Constitution extended the right to vote to a broader group of people—aliens, Indians, and new residents—than did the framers of the U.S. Constitution.[15]  Indeed, the history of article VII, § 1, of the Minnesota Constitution does indicate that the framers intended to require that the right to vote in Minnesota be extended to a more diverse cross-section of the populace than what was then mandated by the U.S. Constitution.   William Anderson and Albert J. Loeb, *A History of the Constitution of Minnesota with the First Verified Text*, 123-24, 178, University of Minnesota Press (1927).  However, controversies involving the right to vote may involve distinct and separate issues, and here, plaintiffs focus on the wrong issue.

The plaintiffs' analysis of the historical background of our state constitution focuses on the framers' willingness to permit diverse groups of people to exercise the right to vote, which implicates issues of discrimination, particularly of a racial and ethnic nature.  But the certified question does not call for this kind of analysis.  Rather, the

---

[15]     Two versions of the 1857 Constitution were produced—a Republican version and a Democratic version—but the text of article VII, § 1, in both versions is the same, except for a few differences in punctuation that do not affect its meaning.  William Anderson and Albert J. Loeb, *A History of the Constitution of Minnesota with the First Verified Text*, 123-24, 178, University of Minnesota Press (1927).

question invites us to determine whether the failure of the City of Minneapolis to hold

city council elections immediately after ward redistricting infringes upon *all* Minneapolis

residents' right to vote—regardless of whether the voters affected by that failure are

members of a suspect class. It does not follow from the framers' extension of the right to

vote and other rights to a broader cross-section of the populace that the framers intended

that the Minnesota Constitution should provide greater protection to the right to vote

under the redistricting circumstances presented here. Here, in essence, we conclude that

the plaintiffs have provided us with little relevant constitutional history that supports their

argument.

It is undisputed that the right to vote is a fundamental right under both the federal

and state constitutions,[16] and under both constitutions any potential infringement is

examined under a strict scrutiny standard of review. It is equally well-established that to

maintain fair, honest, and orderly elections, states may impose regulations that in some

---

[16]   *See Erlandson v. Kiffmeyer*, 659 N.W.2d 724 (Minn. 2003), where we said:

Our review must be informed by the recognition that "[n]o right is more
precious in a free country than that of having a voice in the election of those
who make the laws under which, as good citizens, we must live. Other
rights, even the most basic, are illusory if the right to vote is undermined."
*Burson v. Freeman*, 504 U.S. 191, 199, 112 S. Ct. 1846, 119 L. Ed. 2d *730
5 (1992) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L.
Ed. 2d 481 (1964)). "The right to vote * * * is a fundamental and personal
right essential to the preservation of self-government." *State ex rel. South
St. Paul v. Hetherington*, 240 Minn. 298, 303, 61 N.W.2d 737, 741 (1953).
Indeed, it is this paramount importance of the right to vote that imbues the
state with a compelling interest in preserving the orderliness and integrity
of the election process. *See Burson*, 504 U.S. at 199, 112 S. Ct. 1846.

measure burden the right to vote. E.g., *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103

S. Ct. 1564, 1569-70 (1983). As part of its effort to harmonize these competing interests,

the Supreme Court has articulated the analytical approach it will use to address these

interests when it considers a challenge to a state's electoral regulations:

> When deciding whether a state election law violates the First and
> Fourteenth Amendment associational rights, we weigh the "character and
> magnitude" of the burden the State's rule imposes on those rights against
> the interests the State contends justify that burden, and consider the extent
> to which the State's concerns make the burden necessary. Regulations
> imposing severe burdens on plaintiffs' rights must be narrowly tailored and
> advance a compelling state interest. Lesser burdens, however, trigger less
> exacting review, and a State's "'important regulatory interests'" will
> usually be enough to justify "'reasonable, nondiscriminatory restrictions.'"
> No bright line separates permissible election related regulation from
> unconstitutional infringements on First Amendment freedoms.

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59, 117 S. Ct. 1364 (1997)

(citations omitted); *see also Celebrezze*, 460 U.S. at 788, 103 S. Ct. at 1570.

We have cited to the Supreme Court's analytical approach with approval when

deciding whether a state election law violates the U.S. Constitution. *In re Candidacy of

Independence Party Candidates Moore v. Kiffmeyer*, 688 N.W.2d 854, 860 (Minn. 2004)

(citing *Timmons*, 520 U.S. at 358-59); *see also Clayton*, 688 N.W.2d at 128-29 (citing

*Celebrezze*, 460 U.S. at 788-89, 103 S. Ct. 1564). We have indicated that we will weigh

the character and magnitude of the burden imposed on voters' rights against the interests

the state contends justify that burden, and we will consider the extent to which the state's

concerns make the burden necessary. *Id.* We conclude that it is appropriate to apply a

similar test when analyzing plaintiffs' right-to-vote claims under the Minnesota

Constitution.

Applying this test to the facts and circumstances of the case before us, we agree with the federal district court that the failure of the City of Minneapolis to hold elections immediately following decennial redistricting places a burden on Minneapolis residents' right to vote. In doing so, we acknowledge that the principles of mathematical equality and majority rule are important considerations when conducting a right-to-vote analysis. But mathematical equality in representation is not required at all times during the census and election cycles and, further, those concerns cannot outweigh all other factors. *French v. Boner*, 963 F.2d 890, 891-92 (6th Cir. 1992) (citing *Reynolds*, 377 U.S. at 583, 585). Requiring rigid mathematical equality at all times would result in a sacrifice of stability and experience due to shorter terms, increase the costs of elections for taxpayers, make it more difficult for citizens of limited means to participate in local elective politics, and undermine the settled expectations that both voters and elected officials hold. *Id.*

The current Minneapolis City Council members were elected in a lawful election based on districts validly drawn in 1992. We agree with the line of cases cited by the federal court holding that the failure of the City of Minneapolis to hold prompt elections following the decennial redistricting does not necessarily render such a prior election unconstitutional. *See* supra, n.4. Specifically, we conclude that, under the facts and circumstances presented here, the failure to hold prompt elections does not unconstitutionally burden the right to vote. We reach this conclusion because the benefits of stability that we enumerated in the previous paragraph outweigh other considerations. Moreover, plaintiffs have not shown that following federal precedent will lead to a sharp or radical departure from our previous decisions or approach to the law. Nor have they

shown that the basic civil liberties of the citizens of our state are not adequately protected if we favor uniformity by following federal precedent. Accordingly, at this time, we see no compelling reason to chart a new course for the right to vote under the Minnesota Constitution.

We conclude that plaintiffs have failed to provide any principled basis for us to reach a clear and strong conviction that, under the facts and circumstances of this case, we should depart from the concept of uniformity by holding that the Minnesota Constitution provides greater protection to the right to vote than does the U.S. Constitution. Therefore, we hold that the Minnesota Constitution does not provide greater protection to the right to vote than does the U.S. Constitution such that the failure of the City of Minneapolis to hold elections immediately following decennial redistricting violates the Minnesota Constitution. Accordingly, we answer the first part of the federal court's certified question—whether the Minnesota Constitution grants greater protection to a Minneapolis citizen's right to vote—in the negative. We note, however, that with this holding, we do not foreclose the possibility that under other facts and circumstances, a successful argument may be made that greater protection for the right to vote exists under the Minnesota Constitution.

V.

We next consider whether the failure of the City of Minneapolis to hold elections immediately following decennial redistricting violates Minn. Stat. §§ 204B.135, subd. 1,

32

and 204B.14, subd. 1a (2004) (collectively "the statutes").[17]  Plaintiffs urge us to answer this part of the question in the affirmative, basing their position entirely upon their contention that the statutes contain an implied requirement that cities must hold elections immediately after redistricting plans are adopted—a requirement that plaintiffs characterize as "timely implementation."  Plaintiffs base this contention on the premise that, even though the language of the statutes only requires cities to *adopt* redistricting plans within certain time frames, those time frames are unnecessary if cities are not required to "timely implement" the redistricting plans as well.  Because there is no case law interpreting the relevant statutes, plaintiffs base their argument on canons of statutory construction.

Plaintiffs cite the canon stating that statutes must be construed with reference to the objects sought to be accomplished; in other words, their clear purpose.  *See Knopp v.*

---

[17]     Minnesota Statutes § 204B.135, subd. 1 (2004), reads:

A city that elects its council members by wards may not redistrict those wards before the legislature has been redistricted in a year ending in one or two.  The wards must be redistricted within 60 days after the legislature has been redistricted or at least 19 weeks before the state primary election in the year ending in two, whichever is first.

Minnesota Statutes § 204B.14, subd. 1a (2004), reads:

It is the intention of the legislature to complete congressional and legislative redistricting activities in time to permit counties and municipalities to begin the process of reestablishing precinct boundaries as soon as possible after the adoption of the congressional and legislative redistricting plans but in no case later than 25 weeks before the state primary election in the year ending in two.

*Gutterman*, 258 Minn. 33, 40, 102 N.W.2d 689, 695 (1960). We have stated that "every statute is understood to contain by implication, if not by express terms, all provisions necessary to effectuate its object and purpose." *Sullivan v. Credit River Township*, 299 Minn. 170, 174, 217 N.W.2d 502, 505 (1974). Taking these principles together, plaintiffs assert that the clear purpose of the statutes' set time frame during which cities must adopt redistricting plans is to require cities to "adopt and implement redistricting plans for municipal wards as quickly as reasonably possible" by holding elections with newly-drawn wards as quickly as possible.

The plaintiffs go on to assert that if redistricting occurs in a year in which there is no regularly scheduled election, cities must hold a special election during that year in order to comply with the statutory requirement. Plaintiffs claim that theirs is the only reasonable interpretation of the statutes because there would be no "object and purpose" for the requirement that redistricting plans be adopted at least 19 weeks before the primary election in a year ending in two if those plans would not be implemented by holding an election shortly after the plans are adopted. According to the plaintiffs, the legislature would not have intended cities to adopt redistricting plans so quickly "only to then let the new plan[s] sit on the shelf while boundaries adopted ten or more years ago continue to be used."

Plaintiffs encourage us to analyze the statutes as we analyzed the open meeting statute in *Sullivan*, 299 Minn. 170, 217 N.W.2d 502. At issue in *Sullivan* was a statute that requires all local government meetings to be open to the public. *See* Minn. Stat. § 471.705 (1971). In *Sullivan*, we interpreted section 471.705 to contain an implied

34

requirement of advance notice to the public for any meeting that the public would not reasonably know is to take place, reasoning that a meeting of which the public is unaware is not truly a meeting open to the public. 299 Minn. at 174, 217 N.W.2d at 505. But the redistricting scheme under the statutes at issue in this case is distinguishable from the open meeting statute that we interpreted in *Sullivan*. Here, the statutes are not rendered meaningless simply because cities do not hold special elections immediately after redistricting in those years in which regular elections are not scheduled. We are persuaded by the defendants' argument that the statutes' timelines are designed simply to ensure that redistricting occurs promptly after every decennial census, so that new districts are established in time to be used in *regular elections* taking place in years ending in two. In fact, new redistricting plans will be used for the next set of regularly scheduled elections after the new plans are adopted; so old plans are no longer "used," but are rather phased out once new plans are adopted.

Further, we note that if the legislature had intended to require a city to "timely" implement its new redistricting plan by holding a special election when a new plan is adopted in a year in which no regular elections are scheduled, then the legislature could have explicitly stated as much in the statutes. We know that the legislature is capable of articulating this distinction because, in accordance with statutes and provisions of the Minnesota Constitution, certain other elective offices in the state of Minnesota are required to be filled through elections held following a decennial census and redistricting even if that requirement results in shortened terms of office. Minnesota

Statutes § 375.025, subd. 4 (2004), provides for special elections in the case of county commissioners when a county is redistricted, unless the change made in the boundaries of a district is less than five percent of the average of all districts in the county. Further, article IV, § 4, of the Minnesota Constitution provides that state senators shall all be elected at the same time for four-year terms, and that "there shall be an entire new election of all the senators at the first election of representatives after each new legislative apportionment."

We decline to read into the statutes any additional requirement that cities must immediately hold special elections after redistricting. We conclude that Minn. Stat. §§ 204B.135, subd. 1, and 204B.14, subd. 1a, do not require the City of Minneapolis to hold special elections immediately following decennial redistricting; therefore, the City of Minneapolis's failure to hold prompt elections following decennial redistricting does not violate those statutes. We believe that the legislature is the appropriate forum to address the statutory issues raised by plaintiffs and that, if the legislature wishes to make any change, it can and will. Accordingly, we answer the second part of the federal district court's certified question—whether the city's failure to hold prompt elections violated Minn. Stat. §§ 204B.135, subd. 1, and 204B.14, subd. 1a—in the negative.

We hold that, under the specific facts and circumstances presented by the federal district court's certified question, the Minnesota Constitution does not provide greater protections to the right to vote than does the U.S. Constitution, and that the City of Minneapolis's failure to hold prompt elections following decennial redistricting does not

violate either the Minnesota Constitution or Minn. Stat. §§ 204B.135, subd. 1, and 204B.14, subd. 1a. Therefore, the certified question is answered in the negative.

PAGE, J., took no part in the consideration or decision of this case.